# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
Filed: August 3, 2023

| | | |
|---|---|---|
| * * * * * * * * * * * * | | |
| FRANK CRAWFORD, | * | |
| | * | |
| Petitioner, | * | No. 18-198V |
| | * | |
| v. | * | Special Master Gowen |
| | * | |
| SECRETARY OF HEALTH | * | Decision on Damages; Influenza; |
| AND HUMAN SERVICES, | * | Vasovagal event; Pain and suffering; |
| | * | Reduction of Costs. |
| Respondent. | * | |
| * * * * * * * * * * * * | | |

*Richard Gage,* Richard Gage, P.C., Cheyenne, WY, for petitioner.
*Emilie Williams,* U.S. Dept. of Justice, Washington, D.C., for respondent.

## DECISION ON DAMAGES[1]

On February 8, 2018, Frank Crawford ("petitioner") filed a petition for compensation in the National Vaccine Injury Compensation Program.[2] Petition (ECF No. 1). Petitioner alleged that the influenza ("flu") vaccine he received on September 6, 2016, caused him to suffer nausea and vomiting, which resulted in him falling and sustaining a head, shoulder, and hip injuries. *Id*. A ruling on entitlement was issued on July 27, 2023, finding that petitioner suffered severe nausea and vomiting within hours of the vaccination resulting in a vasovagal event in which he lost consciousness, suffered an open laceration of the forehead, a displaced, comminuted fracture of the left shoulder, a small fracture of the pelvis and a compression fracture of the L1 vertebrae. As a result of the left shoulder fracture, he underwent a total shoulder replacement and subsequent physical therapy. Ruling on Entitlement (ECF No. 104).

---

[1] Pursuant to the E-Government Act of 2002, *see* 44 U.S.C. § 3501 note (2012), because this decision contains a reasoned explanation for the action in this case, I am required to post it to a publicly available website. This decision will appear at https://www.govinfo.gov/app/collection/uscourts/national/cofc or on the Court of Federal Claims website. **This means the decision will be available to anyone with access to the Internet.** Before the decision is posted on the court's website, each party has 14 days to file a motion requesting redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). "An objecting party must provide the court with a proposed redacted version of the decision." *Id*. **If neither party files a motion for redaction within 14 days, the decision will be posted on the court's website without any changes.** *Id*.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to 34 (2012) (hereinafter "Vaccine Act" or "the Act"). Hereinafter, individual section references will be to 42 U.S.C. § 300aa of the Act.

For the reasons discussed below, I find that petitioner is entitled to an award of $145,000.00 for actual pain and suffering. Additionally, petitioner is entitled to unreimbursable expenses of $180.00.

### I.     Background

The Ruling on Entitlement provides a procedural history of this case, including the parties' efforts to resolve the case, and that procedural history is incorporated herewith and shall not be repeated.

Additionally, the Ruling on Entitlement provides a detailed recitation of the petitioner's medical history after he received the flu vaccine at issue in this matter. The petitioner also provided sworn affidavits and testified at the entitlement hearing about his pain and suffering which is also recounted in the entitlement decision. Thus, those sections of the Ruling on Entitlement are incorporated herewith and shall not be repeated.

After the entitlement hearing on April 14-15, 2021, the parties submitted post-hearing briefs, which included their positions on an appropriate amount of compensation for pain and suffering that should be awarded to petitioner. Pet. Post-Hearing Brief ("Pet. Brief") (ECF No. 103); Resp. Post-Hearing Brief ("Resp. Brief) (ECF No. 102).

This matter is now ripe for adjudication.

### II.    Legal standard

The Vaccine Act provides that "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury," a petitioner may recover "an award not to exceed $250,000." 42 U.S.C. § 300aa-15(a)(4). With regard to pain and suffering and all other elements of damages, the petitioner bears the burden of proof and the medical records are the most reliable evidence of petitioner's condition. *See, e.g.*, *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996); *Shapiro v. Sec'y of Health & Hum. Servs.,* 101 Fed. Cl. 532, 537-38 (2011).

Prior to my appointment as a special master, former Chief Special Master Golkiewicz and others developed an approach with the goal "to fairly treat all petitioners" by "creat[ing] a continuum of injury", in which the statutory cap was reserved for the most severe injuries and lower awards were made for less severe injuries. *Hocraffer v. Sec'y of Health Human Servs.*, No. 99-533V, 2007 WL *914914, at *5 (Fed. Cl. Spec. Mstr. Feb. 28, 2007). In *Graves,* Judge Merow granted review of a special master's pain and suffering award, holding that the "continuum" approach was not "rooted in the statute or precedent". *Graves v. Sec'y of Health and Human Servs.,* 109 Fed. Cl. 579, 590 (2013). Judge Merow set forth a different approach in which the first step is to assess an individual petitioner's pain and suffering by looking to the record evidence, without regard to the $250,000 cap. Only then as a second step, if the award would exceed $250,000, must it be reduced to that maximum. *See id.* at 589-90.

In the Vaccine Program's subsequent history, special masters have of course not been bound by *Graves*.³ However, they have found it to be persuasive. *See, e.g.*, *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *10 (Fed. Cl. Spec. Mstr. Moran April 19, 2013) ("Under the interpretation of the statute offered in *Graves*, cases that used the spectrum approach, such as *Hocraffer* and *Long*, are no longer useful measuring points"); *Reed v. Sec'y of Health & Human Servs.*, No. 16.1670V, 2019 WL 1222925, at *12 (Fed. Cl. Chief Spec. Mstr. Dorsey Feb. 1, 2019) ("it must be stressed that pain and suffering is not based on a continuum"); *Selling v. Sec'y of Health & Human Servs.*, No. 16-588V, 2019 WL 3425224, at *5 (Fed. Cl. Spec. Mstr. Oler May 2, 2019) ("Pain and suffering is not, however, determined based on a continuum"); *Dillenbeck v. Sec'y of Health & Human Servs.*, No. 17-428V, 2019 WL 4072069, at *13 (Fed. Cl. Spec. Mstr. Corcoran July 29, 2019) ("… special masters appear to have accepted *Graves*'s methodology since issuance of that decision… I will apply it herein as well, although I do so mindful of the need to consider the overall strength of petitioner's showing herein"), *motion for review granted and remanded on other grounds,* 147 Fed. Cl. 131 (2020); *W.B. v. Sec'y of Health & Human Servs.*, No. 18-1364V, 2020 WL 5509686, at *3 (Fed. Cl. Chief Spec. Mstr. Corcoran Aug. 7, 2020) ("it must be stressed that pain and suffering is not based on a continuum"). I agree with this prevailing approach and have followed it in assessing pain and suffering damages in other SIRVA cases. *See Desai v. Sec'y of Health & Human Servs,* No. 14-811V, 2020 WL 8768069 (Fed. Cl. Spec. Mstr. Dec, 21, 2020), *recon. denied,* 2020 WL 8184767 (Fed. Cl. Spec. Mstr. Dec. 18, 2020).; *Yost v. Sec'y of Health & Human Servs.,* No. 18-288V, 2022 WL 4593029 (Fed. Cl. Spec. Mstr. Aug. 29, 2022); *Youngmark v. Sec'y of Health & Human Servs.,* No. 17-1431V, 2022 WL 2306867 (Fed. Cl. Spec. Mstr. May 25, 2022); *Galante v. Sec'y of Health & Human Servs.*, No. 18-1933V, 2023 WL 1515357 (Fed. Cl. Spec. Mstr. Jan. 13, 2023). I assess the full value of the damages in a particular case before me, then apply the statutory cap if that becomes necessary.

There is no mathematical formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D.*, 2013 WL 2448125, at *9 ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *Id.* at *9 (internal citations omitted). I find it appropriate to also consider any impairments in function and/or lost ability to participate in activities which the petitioner previously enjoyed, as a result of the injury.

A special master may also consider prior pain and suffering awards, especially for similar injuries, from both inside and outside of the Vaccine Program to aid the resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). A special master may also rely on his or her own experience adjudicating similar claims. *Hodges v. Sec'y of*

---

³ Decisions of special masters and the U.S. Court of Federal Claims constitute persuasive but not binding authority. *Hanlon v. Sec'y of Health & Human Servs.*, 40 Fed. Cl. 625, 630 (1998). In contrast, the Federal Circuit's holdings on legal issues are binding on special masters. *Guillory v. Sec'y of Health & Human Servs.*, 59 Fed. Cl. 121, 124 (2003), *aff'd*, 104 F. App'x 712 (Fed. Cir. 2004); *see also Spooner v. Sec'y of Health & Human Servs.*, No. 13-159V, 2014 WL 504728, at n.12 (Fed. Cl. Spec. Mstr. Jan. 16, 2014).

*Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

### III.  Parties' arguments

#### 1. Petitioner's position

Petitioner asserts that he is entitled to the "full statutory amount of $250,000.00 in past pain and suffering," plus $9,018.27 in non-reimbursable out-of-pocket expenses. Pet. Brief at 24. To support his position, petitioner argues that he suffered a broken shoulder, a broken hip, a fractured L1 vertebrae, a concussion leaving a permanent scar on his forehead, and he developed stress ulcers as a result of his injuries. *Id.* at 23. Additionally, petitioner stated that he "underwent a complete shoulder replacement surgery," and the rehabilitation process after his shoulder surgery was "more severe than anything he had ever experienced, and the rehabilitation process was terrible." *Id.*

Additionally, petitioner states that the L1 fracture is a "permanent impairment and he has a permanent scar on his forehead." Pet. Brief at 23. Further, petitioner states that he was "unable to sleep for a time," and that he "continues to suffer limits in his left shoulder and arm and ulcers." *Id.* Petitioner argued that if he is not awarded the full statutory amount of $250,000.00 that he is entitled to future pain and suffering because his left arm will never be fully functional again. *Id.*

#### 2. Respondent's position

Respondent argued that an award of $95,000.00 for petitioner's pain and suffering is supported by the record and that the record does not support a claim for future pain and suffering. Resp. Brief at 24.

Respondent stated that petitioner's alleged vaccine related injuries include a laceration on his forehead, a fractured pelvis, a spinal injury, and his broken left shoulder. Resp. Brief at 24. Respondent stated that during the hearing petitioner testified that his left shoulder injury was "really painful" and that it was "some of the worst pain that [he's] ever felt." *Id.* (citing Tr. 18-19). Further, respondent observed that petitioner testified that his surgeon was "wonderful" and with physical therapy he was able to resume the use of his arm, including return to work. Tr. 19. Respondent conceded that petitioner did explain that he has residual weakness in his left arm and periodic numbness in his left hand, but that the medical records do not support this ongoing symptom, aside from petitioner's testimony. Resp. Brief at 25.

With respect to petitioner's hip, spine and pelvic injury, respondent stated that petitioner testified that he had "no residual damages from the pelvis [injury]" and that his L1 vertebrae injury "was painful at first, but certainly nothing like the shoulder, and it healed fine, and I have no residual deficits or anything." *Id.* at 25; *see also* Tr. 21.

4

Respondent argued that petitioner's recovery after his injury was "good," and "comparatively quick when compared to other Program cases." Resp. Brief at 25. Respondent asserted that petitioner's "entire medical record consists of active treatment for just over two months, from his vaccination in early September 2016, through his last documented [physical therapy] session on November 10, 2016." *Id.* Additionally, respondent averred that petitioner "testified to his pain and suffering at and around the time of the injury, but his injuries mostly resolved, and his primary complaint at the time of the hearing was reduced strength in his left arm, a subjective complaint not addressed in his records." *Id.*

Respondent cited to *Hietpas,* a vasovagal syncope case where Chief Special Master Corcoran awarded $140,000.00 in pain and suffering in a reasoned damages decision. Resp. Brief at 26. In *Hietpas,* petitioner suffered a vasovagal syncope and fractured her jaw, requiring multiple jaw surgeries, physical therapy, and a cast for one year. *Hietpas v. Sec'y of Health & Human Servs.,* No. 19-1702, 2021 WL 688620 (Fed. Cl. Spec. Mstr. Jan. 5, 2021). Respondent stated that the petitioner in *Hietpas* presented medical evidence of ongoing physical symptoms, including difficulty speaking, as well as, evidence of emotional trauma. Resp. Brief at 26. Whereas in the present case, petitioner did not experience any structural facial injury nor indefinite emotional trauma, and he recovered from his injuries more quickly. *Id.*

Respondent also cited a vasovagal syncope case involving a minor, *H.S.,* where the petitioner was awarded $60,000.00 in pain and suffering. The petitioner in *H.S.* fell after vaccination, resulting in head trauma, a concussion, and skull and a C1 vertebra factures. *H.S. v. Sec'y of Health & Human Servs.,* No. 14-1057V, 2015 WL 6155891 (Fed. Cl. Spec. Mstr. Sept. 25, 2015). In *H.S.* the petitioner was required to wear an immobilizing cast for six weeks and was unable to participate in sports. *Id.* at *3. Special Master Dorsey reasoned that $60,000.00 was an appropriate amount to award in pain and suffering because the minor did not have a permanent injury, but was unable to participate in sports for nearly six months. *Id.* at *3.

Respondent included cases that were resolved on stipulation and proffer, where the awards arranged from $45,000.00 to $175,000.00 in pain and suffering following a vasovagal syncope injury. Resp. Brief at 27. While cases resolved on stipulation or proffer provide some details as to the injury and the vaccine at issue and offer a range of awards, they provide little insight as to the reasoning for such amount being awarded.

Respondent argued that "in terms of recovery" petitioner's injury was similar to a SIRVA (a shoulder injury) which required shoulder surgery and physical therapy. Resp. Brief at 27. Respondent stressed that petitioner testified that "he had no ongoing pain with only reduced strength in his left arm and no lasting injury, along with no documented medical treatment after November 2016." *Id.* Additionally, respondent stated that petitioner had been working only part-time when his injury occurred and that he was only out of work for about six-months or less because of his injury. *Id.* at 26-27; *see also* Tr. 23.

With respect to petitioner's out-of-pocket expenses, respondent stated that petitioner provided invoices from 2017 through 2019 "that are not clearly related to his alleged vaccine injuries." Resp. Brief at 28. Respondent asserted that "No corresponding medical records of treatment for his injuries dating from those years were submitted," and that petitioner was

5

seeking "reimbursement for private insurance premiums and costs unrelated to [petitioner's] vaccine injury for which the Program is not responsible." *Id.* Respondent stated that he does "not necessarily object to reimbursement of petitioner's actual, documented out-of-pocket expenses related to his injuries allegedly caused by the vaccine at issue, so long as they are within the appropriate time period that the evidence supports petitioner experienced the sequela of his injury (i.e. from September 2016 to November 2016)." *Id.*

### IV.    Discussion and conclusion

#### 1. Pain and suffering

As noted above, factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9. Impairment of function and loss of activities are also considered. It does not appear that the parties dispute petitioner's awareness of his injury. The medical records demonstrate that two days after petitioner received the flu shot, he suffered a syncope event which resulted in him hitting his head, fracturing his left shoulder, a fractured pelvis, and compressed L1 vertebrae. The main dispute between the parties is the severity of petitioner's injuries and the duration of petitioner's pain.

I find that petitioner initially experienced a moderate to severe left shoulder injury that occurred two days after the vaccination. The medical records and petitioner's testimony reflect that his left shoulder injury after his fall was severe and intense. For example, when petitioner was finally admitted to the hospital following his initial discharge from the emergency room, Dr. Jeffery Ratusznik wrote that petitioner had "severe" pain in his left arm with any attempts at should range motion. Pet. Ex. 4 at 172. Dr. Ratusznik wrote that petitioner "complains of pain localized to the left shoulder." *Id.* Petitioner had a CT scan of his left shoulder which showed an "acute comminuted displaced proximal left humeral fracture," and that the "fracture lines extend through the humeral neck, and through the base of the greater tuberosity, and through the subscapital region." *Id.* at 243. Additionally, the CT showed that the "humeral head is dislocated anteriorly out of the bony glenoid," and that there "is [an] acute fracture of the anterior, inferior bony glenoid with small adjacent fracture fragments." *Id.*

On September 9, 2016, petitioner had a consult with orthopedist Dr. Jeffrey Ratusznik. Pet. Ex. 6 at 3. Dr. Ratusznik had reviewed petitioner's left shoulder x-ray and recommended that petitioner undergo an "open reduction and internal fixation." Pet. Ex. 6 at 2. On September 11, 2016, petitioner had a left reverse shoulder replacement performed by orthopedic surgeon, Dr. Gurpreet Bajaj. *Id.* at 4. Petitioner's pre-and-post-operative diagnosis was "left proximal humerus fracture dislocation." *Id.*

Petitioner testified that when his left shoulder injury occurred it was "some of the worst pain that I've ever felt." Tr. 18. He testified that while he was admitted to the hospital after his second seizure, he was experiencing "severe pain in the upper arm," and that his wife asked the x-ray technician to take a picture of his left shoulder, which is when his fracture was discovered. Tr. 16. Petitioner testified that after his shoulder surgery he was initially discharged to a rehabilitation facility and "it was terrible." Tr. 20.

6

On October 10, 2016, petitioner had a follow-up appointment with Dr. Bajaj, where petitioner reported that he was "very unhappy with his facility." Pet. Ex. 6 at 9. At this appointment, petitioner also told Dr. Bajaj that he wanted to start physical therapy as soon as he got back from getting an implant in his femur. *Id.* Petitioner had normal flexion, extension and rotation in his left shoulder and Dr. Bajaj recorded petitioner's motor strength as "normal." *Id.* Dr. Bajaj wrote petitioner a referral to physical therapy.

Petitioner had his initial physical therapy evaluation on October 12, 2016. Pet. Ex. 4 at 27. At this appointment, petitioner reported that his pain was a 2 out of 10 and that the pain ranged from a 0 to an 8. *Id.* He described the pain was "stabbing" and "intermittent," and that the pain was worse with movement. *Id.* Petitioner also reported some residual pain in his low back region. *Id.* Petitioner's strength in his left shoulder was recorded as a 3 or 3+ depending on the movement and he demonstrated a somewhat reduced range of motion compared to his right shoulder. *Id.* at 28. For example, petitioner had 120 degrees of active range of motion in his left shoulder on flexion, while with his right shoulder, he had full range at 160 degrees. *Id.* However, his external rotation for both shoulders was equal. *Id.*

Petitioner's last physical therapy session was on November 10, 2016. Pet. Ex. 4 at 21, 25. At this appointment petitioner reported that his left shoulder pain was a 0/10, but had been a 6/10 the past week. *Id.* at 25. Petitioner also reported that his low back had been hurting, but that the pain was variable and intermittent. *Id.* Under "Functional Characteristics and Analysis" it was recorded that petitioner "demonstrates significant improvement in the [left] shoulder range of motion and overall functional mobility. He has met the maximum level of improvement expected with left shoulder flexion, internal rotation, and abduction range of motion but I expected that he will be able to make gains with external rotation range of motion with continued therapy." *Id.* It was recommended that petitioner continue physical therapy twice a week for two additional weeks to focus on "gentle strengthening of [the] upper extremities, core stabilization to address low back pain, and work on functional mobility." *Id.* However, petitioner did not continue physical therapy. When petitioner was discharged from physical therapy on December 30, 2016, it was noted that continued physical therapy was recommended, but that petitioner did not return for any additional visits after the November 10th appointment. *Id.* at 21.

After participating in 9 physical therapy sessions, petitioner had a follow-up appointment with Dr. Bajaj on November 7, 2016. Pet. Ex. 6 at 11. Petitioner reported that he was not experiencing much pain in his hip anymore and that the physical therapy for his left shoulder "has improved his range of motion." *Id.* Additionally, petitioner reported that he was going back to work on November 10, 2016. *Id.* Petitioner informed Dr. Bajaj that he was not taking any pain medication at the time. *Id.* Dr. Bajaj recorded that petitioner had normal strength and normal range of motion in his left shoulder. *Id.* He wrote that petitioner was "released to go back to work," and that petitioner needed to continue physical therapy to continue to strengthen his left shoulder. *Id.*

There is no doubt that after petitioner fell, he suffered a concussion, had a fractured pelvis, compressed vertebrae, and had a broken left shoulder. These injuries, when they initially

7

occurred, were severe. Petitioner testified that his head injury was "superficial" and that he had "no problems with my head after it stopped bleeding." Tr. 18. Petitioner also testified that his fractured pelvis was "initially painful, but nothing like his left shoulder, and…it just healed up fine and I'm fine. I mean, I have no residual damages from the pelvis." Tr. 20. Petitioner stated that he had "no residual deficits or anything, pain," from his L-1 injury. Tr. 21. He testified that it was "painful at first," but nothing like the pain in his shoulder. *Id.* The duration of pain petitioner suffered from his head, pelvis, and back injury appear to have been relatively short lived. Petitioner's left shoulder injury, however, was more severe than the other injuries and continued to affect him for a longer period of time than the other injuries and caused him to undergo major surgery to totally replace his left shoulder.

Petitioner testified that the pain in his shoulder was the worst pain he had ever felt. Tr. 18. Further, once the x-ray and CT scan revealed the shoulder fracture, it appears the primary focus of his hospitalization was his left shoulder. Within three days of his fall, he underwent a reverse shoulder replacement and then had in-patient care for nearly a month. *See generally* Pet. Ex. 7.

He was in physical therapy after the surgery for nine sessions and he did not return to physical therapy after November 10, even though it was recommended that he do so for additional strengthening of his left shoulder. *See* Pet. Ex. 4 at 21. At his last physical therapy appointment, he had reported that his range of pain was a zero to six. When he saw Dr. Bajaj, the orthopedic surgeon, petitioner stated that he was not taking any pain medication. Additionally, it was approximately two months from the date of petitioner's fall to when he returned to part time work as an orthodontist. *See* Pet. Ex. 6 at 11. Petitioner did report some minor residual weakness in his left hand, however, that appears to have a minimal impact on petitioner and the function of his left upper extremity.

The two cases respondent cites, *Hietpas* and *H.S.*, are limited in usefulness as most of the injuries the petitioners suffered in those cases were to their neck, face, and teeth. In this case, the petitioner testified that he had a scar over his left eye, but that it was a "nonissue" to him. *See* Tr. 18. Instead, as respondent stated in his brief, the petitioner's recovery in this case was more akin to a Shoulder Injury Related to Vaccine Administration ("SIRVA"). Resp. Brief at 27. There are many reasoned damages decisions in SIRVA cases that involve surgical intervention. For example, in *Lagle*, I awarded the petitioner $130,000.00 for pain and suffering after he suffered a shoulder injury after vaccination to his dominant arm. *See Lagle v. Sec'y of Health & Human Servs.* No. 16-1053V, 2023 WL 3035370 (Fed. Cl. Spec. Mstr. Apr. 21, 2023). In *Lagle,* the petitioner did not participate in physical therapy afterwards, but he testified that he had residual pain on a daily basis and was taking over-the-counter medication to control his pain. *Id.* at * 3. In this case, petitioner suffered multiple injuries, including a fractured pelvis, concussion, and compressed vertebrae, along with his broken left shoulder. While petitioner was able to return to work within three months of his injury, he also had to stay in a rehabilitation facility after his hospitalization and then he participated in nine sessions of physical therapy.

Given that petitioner's initial injuries included a forehead laceration and concussion, a severe, displaced, comminuted fracture of the shoulder, a fractured pelvis, a compressed vertebrae fracture and that petitioner underwent a reverse total left shoulder replacement,

8

followed by in patient care in a rehabilitation facility for a month post-surgery, petitioner is entitled to an award of $145,000.00 in pain and suffering. As the record indicates, petitioner returned to work two months after he suffered his initial injury and he testified that he has minimal residual effects of his injuries, an award for future pain and suffering is not warranted.

### 2. Out-of-pocket expenses

The Vaccine Act provides that compensation available to petitioners for a vaccine-related injury include "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which the petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and, (iii) were for diagnosis, medical or other remedial care, rehabilitation, developmental evaluation, special education, vocational training and placement, case management services, counseling, emotional or behavioral therapy, residential and custodial care and service expenses, special equipment, related travel expenses, and facilities determined to be reasonably necessary." 42 U.S.C. § 300-15(a)(B).

Petitioner stated that he had incurred $9,018.27 in non-reimburseable expenses. Pet. Ex. 26. Respondent stated that he does not oppose the reimbursement of petitioner's "actual documented out-of-pocket expenses related to his injuries," but asserts that petitioner has submitted "invoices from 2017 through 2019 that are not clearly related to his alleged vaccine injuries." Resp. Brief at 28. Respondent also states that "petitioner seeks reimbursement for private insurance premiums and costs unrelated to his vaccine injury for which the Program is not responsible." *Id*.

In petitioner's documented "out-of-pocket" expenses, there do appear to be costs that are unrelated to petitioner's vaccine injury for which he was found entitled to compensation. Petitioner was found entitled to compensation for injuries he sustained on September 8, 2016 after falling, he underwent surgery, inpatient rehabilitation and he participated in nine physical therapy sessions through November 21, 2016. He had a follow-up with the surgeon in December 2016. Petitioner was discharged from physical therapy on December 30, 2016 and has not filed additional medical records demonstrating that he was being treated for any of the injuries related to his vaccine injury after November 10, 2016. *See* Pet. Ex. 4 at 25. Yet, petitioner has submitted bills that include dates from 2017, 2018, and 2019.

The medical records and the billing statement provided also demonstrate that petitioner underwent another surgery to get an implant in his femur to use his prosthetic. *See* Pet. Ex. 6 at 9. This surgery appears to be the source of some of the insurance billing from December 2016, as notated in the Explanation of Benefits and is unrelated to his vaccine-injury. *See* Pet. Ex. 26 at 31. Furthermore, the United Healthcare Explanation of Benefits from 2016 indicated that petitioner's share of costs incurred in 2016 were $4,098.52, however, petitioner did not provide a breakdown of the expenses he incurred related to his vaccine-injuries nor provide any record that petitioner actually paid this sum. The yearly cost provided in the Explanation of Benefits submitted by petitioner only provides a total number and provides no further detail as to what was and what was not related to his vaccine-injury for which he entitled to compensation.

9

Most of the other out-of-pocket costs petitioner was seeking reimbursement for appear to fall outside the timeframe for which he was being treated for his vaccine-related injury. Petitioner submitted a bill from Methodist Mansfield Medical Center for $700.00 with a service date of January 18, 2018 and another bill for $1,100.00 with a service date of March 1, 2019. Additionally, petitioner submitted a request for $2,084.47 for medical bills in 2018, yet the explanation of benefits submitted by the petitioner does not indicate that these medical charges were related to his vaccine injuries. The same is for the $330.00 petitioner is requesting for reimbursement for 2019. Pet. Ex. 26 at 60. The Medstar Mobile Health bill for $471.80 appears to have been incurred in 2019 and falls outside the time period for which petitioner was being treated for his vaccine-related injuries. Pet Ex. 26 at 2.

A review of the Explanation of Benefits from 2016 shows petitioner had co-pays totaling $150.00 for therapeutic exercises to develop strength, endurance, range of motion and flexibility services from October 12-27, 2016. Pet. Ex. 26 at 14-17. The explanation of benefits also includes dates and notations related to petitioner's hospitalization from September 9, 2016 through his discharge date. While the explanation of benefits states, "With claims processed through December 31, 2016, you now have $3,785.52 in out-of-pocket costs that count toward your $4,900.00 out-of-pocket maximum for covered in-network services," from the same document, it appears that petitioner only paid $150.00 in out-of-pocket expenses that were related to his vaccine-related injury. It is unclear what petitioner is claiming as part of the $4,098.52 from 2016 that relates to his vaccine injury, aside from the documented $150.00 in co-pays for his post-surgery therapy. Additionally, the Explanation of Benefits from 2017 documents that at least one of petitioner's physical therapy sessions from 2016 was not billed until January 2016 and petitioner paid a $30.00 co-pay.

In order for petitioner to claim his unreimburseable costs, they must stem from the vaccine-related injury for which he has been found entitled to compensation. Based on the documentation provided by the petitioner, most of the costs submitted are related to medical events that are unrelated to his vaccine-related injuries and occurred outside of dates for which petitioner was being treated for his vaccine related injuries. Given the complete lack of documentation provided by the petitioner as to what his actual out-of-pocket expenses that stemmed from his vaccine-related injury, most of the billing that was submitted was for medical care between 2017 and 2019 without relating that care back to his vaccine injury, I cannot award more than $180.00 for out-of-pocket expenses. This amount is for the $180.00 in co-pays for physical therapy that occurred within the time period for when he was being treated for his vaccine-related injury and which I can reasonably trace to his vaccine injury. Petitioner's counsel is cautioned to be more thorough when submitting costs for reimbursement and to appropriately determine what is related to the vaccine-related injury before submitting general billing statements that provide limited detail or documentation about what costs were actually incurred and how those costs relate to the vaccine injury so that the Court's time is not used inefficiently.

### V.     Conclusion

Based on the record as a whole and arguments submitted by the parties, **I award petitioner a lump sum of $145,180.00, with $145,000.00 for past pain and suffering and**

$180.00 in out-of-pocket expenses.  This amount represents compensation for all damages that would be available under Section 15(a).

The clerk of the Court is directed to enter judgment in accordance with this decision.[4]

**IT IS SO ORDERD.**

s/Thomas L. Gowen
Thomas L. Gowen
Special Master

---

[4] Entry of judgment can be expedited by each party's filings of a notice renouncing the right to seek review. Vaccine Rule 11(a).